**In re Gloria BONNANZIO, Debtor.**

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff–Appellee,**

v.

**Gloria BONNANZIO, Defendant–Appellant.**

**No. 1262, Docket 95–5030.**

United States Court of Appeals, Second Circuit.

Argued March 6, 1996.

Decided July 19, 1996.

Caroline Levy, Northport, NY, for Defendant–Appellant.

Lynne A. Bizzarro, Zodda & Bizzarro, Sayville, NY, for Plaintiff–Appellee.

Before: MINER, JACOBS, and CABRANES, Circuit Judges.

JACOBS, Circuit Judge:

Debtor Gloria Bonnanzio appeals from a judgment of the United States District Court for the Eastern District of New York (Gleeson, *J.*), which reversed the bankruptcy court's decision to discharge her debt to National Union Fire Insurance Company ("National Union"). Bonnanzio had participated in a real estate tax shelter, and defaulted on her debt to the limited partnership. National Union had issued a financial guarantee bond to the partnership, paid on the bond, and won a judgment against Bonnanzio. After Bonnanzio sought protection in bankruptcy, National Union challenged the dischargeability of the debt under 11 U.S.C. § 523(a)(2)(B). Following a bench trial, the bankruptcy court (Ryan, *J.*) found that National Union failed to make two requisite showings under the statute: (1) that Bonnanzio acted with actual or constructive intent to deceive; and (2) that National Union reasonably relied on the (concededly false) financial statement submitted to National Union on Bonnanzio's behalf by her accountant.

The district court reversed on both grounds, holding (1) that the bankruptcy court's ruling on the issue of intent to deceive was premised on an error of law, that National Union had succeeded in establishing Bonnanzio's constructive intent to deceive, and that in any event the accountant's intent

to deceive should have been imputed to Bonnanzio; and (2) that the bankruptcy court's finding on reliance was clearly erroneous. We conclude that intent to deceive under § 523(a)(2)(B) is an issue of fact that should have been reviewed for clear error, and that the bankruptcy court's finding withstands clear error review. However, we vacate the judgment and remand for possible further fact findings concerning imputed intent, a potentially determinative issue identified by the district court but not considered by the bankruptcy court. Furthermore, while we agree with the district court that the bankruptcy court's determination on reliance was clearly erroneous, the bankruptcy court on remand should determine whether National Union has demonstrated that its reliance was reasonable.

## BACKGROUND

The following facts are drawn from the trial transcript and are not disputed.

In 1983, Bonnanzio was looking for investment advice to help her save money for her six-year-old son's college education. She was then a 29–year–old sales representative for Levi Strauss, divorced and living with her parents. In her one year of college, she had taken an economics course, but no course in investments or higher mathematics. One of her clients recommended an accountant named Arthur Berlin for investment advice.

At a meeting in December 1983, Berlin spoke with Bonnanzio for several hours, asked numerous questions about her financial situation and took notes. She told Berlin that she was earning $40,000 to $45,000 per year, and that her only asset was her car. In response to a specific inquiry, Bonnanzio confirmed that her net worth was below $250,-000. During this meeting, Berlin suggested that Bonnanzio invest in tax shelters, but he did not explain what a tax shelter was.

Berlin told Bonnanzio he wanted to meet with her again soon, but Bonnanzio explained that she would be out of town for the holidays. Berlin took the address and telephone number at which she could be reached over the holidays and sent her information there about a limited partnership called Northgate Plaza Associates ("Northgate"). Bonnanzio did not read the material. After Bonnanzio returned in January 1984, Berlin called her numerous times and left messages. When he finally reached her, Berlin said they needed to meet quickly to discuss Northgate.

At the second meeting, early in January, Berlin recommended Northgate as a vehicle for financing her son's education. She asked how the tax shelter worked, but did not understand Berlin's explanation. Berlin told her how much Northgate would cost, but Bonnanzio "didn't understand how [she] could get approved for it based on the fact [she] didn't own anything at the time." She expressed this concern to Berlin, but "[h]e didn't seem to think it was a problem." Also at this meeting, Bonnanzio agreed that Berlin would be her accountant and prepare her 1983 income tax returns.

Sometime before January 30, 1984, Berlin told Bonnanzio that she would have to pay $2,600 in order to participate in the Northgate deal. She did not have the money, but Berlin loaned it to her. Presumably in his role as her accountant, Berlin also contacted her employer and raised the number of withholding allowances on her W–4 form by claiming 45 dependents, which resulted in a $300–per–week increase in Bonnanzio's take-home pay. On January 30, 1984, Bonnanzio met Berlin at the Manhattan offices of Rothschild Reserve International, Inc. ("Rothschild"), the broker-dealer handling the Northgate private placement. There, Berlin assured Bonnanzio that her interest in Northgate could be readily sold if her marital or job status changed. Bonnanzio signed her name to blank forms, including a blank credit application. She also signed a promissory note to pay Northgate $73,663 over six years. At trial, Bonnanzio testified that she did not know she was signing a credit application, that she trusted Berlin, and that she did not intend to deceive anyone in connection with Northgate. After the Rothschild meeting, Berlin filled out the signed credit application using false information that vastly exaggerated Bonnanzio's income and assets.

On February 8, 1984, Rothschild sent Bonnanzio's documents to National Union for bonding. National Union's role in the pri-

vate placement was to guarantee payment to the bank that was financing Northgate, in the event that investors defaulted. The bonds that National Union issued to the bank covered groups of investors in bulk.

At National Union, Bonnanzio's documents were probably reviewed by an employee named Gina Grossman, who handled Rothschild investors. Grossman did not testify at trial. On March 23, 1984, National Union approved Bonnanzio's application and issued a bond guaranteeing the obligations owed by Bonnanzio (and 21 other investors) to Morsemore Federal Savings and Loan Association ("Morsemore"), the bank to which Northgate negotiated Bonnanzio's promissory note.

That same month, Bonnanzio received her first bill from Morsemore, demanding $2,300. Unable to pay, and getting worried, Bonnanzio asked Berlin to extricate her from Northgate. Berlin responded that she would have to pay him $1,800 for him to sell her partnership unit at a discount; later, he offered to sell the unit for $1,000. Bonnanzio accepted neither proposal, possibly because she lacked the funds to extricate herself, and retained the partnership unit.

When Bonnanzio defaulted on the promissory note, National Union paid her obligations, and contacted Bonnanzio to collect. She wrote a letter to National Union's counsel dated October 22, 1984, in which she explained that Berlin had persuaded her to participate in Northgate; that she could not afford the investment; and that she wanted to end her involvement in Northgate. In 1985, National Union sued Bonnanzio in New York state court, and, on August 27, 1991, National Union won a judgment for $152,712.80.

On May 1, 1992, Bonnanzio filed a petition under Chapter 7 in the United States Bankruptcy Court for the Eastern District of New York, seeking in part to discharge her debt to National Union. Thereafter, National Union began an adversary proceeding seeking to have its judgment excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The case was tried in October 1994. The bankruptcy court found that National Union had failed to show (1) that Bonnanzio had acted with actual or constructive intent to deceive, or (2) that National Union had reasonably relied on Bonnanzio's credit application. In a decision dated March 18, 1994, the bankruptcy court discharged National Union's debt.

National Union appealed to the district court, which heard argument on March 17, 1995. The district court reversed, and Bonnanzio appeals.

### DISCUSSION

■■■ National Union sued Bonnanzio under 11 U.S.C. § 523(a)(2)(B), which provides:

A discharge ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

> (B) use of a statement in writing—
>
>> (i) that is materially false;
>>
>> (ii) respecting the debtor's ... financial condition;
>>
>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>
>> (iv) that the debtor caused to be made or published with intent to deceive[.]

A creditor suing under § 523(a)(2)(B) must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991); *In re Furio*, 77 F.3d 622, 624 (2d Cir.1996). "Exceptions to dischargeability are narrowly construed," *Furio*, 77 F.3d at 624 (internal quotation marks omitted), an approach that implements the " 'fresh start' policy of the Bankruptcy Code," *Grogan*, 498 U.S. at 286, 111 S.Ct. at 659.

■■■ The fact findings of the bankruptcy court are reviewed by the district court for clear error, and the conclusions of law are reviewed de novo. *See* Fed. R. Bankr.P. 8013. Our "review of an appeal from the bankruptcy court to the district court is plenary." *Furio*, 77 F.3d at 624.

## A. *Intent to Deceive.*

The bankruptcy court found that Bonnanzio had no actual intent to deceive, and the district court did not disturb that finding. The bankruptcy court further found that, "[c]onsidering the totality of circumstances," Bonnanzio did not have a constructive intent to deceive based on a reckless disregard for the consequences of her actions. In so doing, the bankruptcy court recognized that *In re Reisman*, 149 B.R. 31 (Bankr.S.D.N.Y. 1993), presented similar facts, but distinguished that case on the ground that Reisman was a sophisticated investor and businessperson, and that Bonnanzio emphatically was not. On appeal, the district court (1) was unpersuaded by the bankruptcy court's grounds for distinguishing *Reisman;* (2) characterized the bankruptcy court's resulting conclusion as an error of law (and thus subject to de novo review); and (3) held that Bonnanzio did act with a reckless disregard for the consequences of her actions. Accordingly, the district court concluded that National Union had sustained its burden of demonstrating a constructive intent to deceive. The district court held further that Berlin's fraudulent intent must be imputed to Bonnanzio under agency principles. On appeal, Bonnanzio challenges both the district court's decision to set aside the bankruptcy court's conclusion that National Union had failed to demonstrate reckless disregard and the district court's agency law analysis.

In *Reisman,* the debtor claimed ignorance of the fact that his accountant prepared and delivered false financial statements in order to induce the creditor bank to extend him credit. *Id.* at 33. The bankruptcy court found the requisite intent to deceive, because (1) the debtor was on notice that the financial statements might be necessary to secure the loan; (2) bank personnel in fact discussed the statements with him; (3) reckless indifference or disregard for the accuracy of a financial statement amounts to an intent to deceive; and (4) in any case, the debtor accepted the benefits of his accountant's misdeeds, and thus was liable on agency principles. *Id.* at 38. Although Reisman's sophistication can easily be deduced from the statement of facts, the bankruptcy

court in *Reisman*—as the district court here noted—nowhere cited the debtor's business savvy in support of its finding of an intent to deceive. Nevertheless, we conclude that the district court erred in characterizing the bankruptcy court's analysis of intent to deceive as a conclusion of law premised on a misreading of *Reisman,* and in reviewing the intent issue de novo. At the hearing, the district court said:

> I am not persuaded that the distinction relied upon by Judge Ryan is supported by the *Reisman* decision or by its rationale. For that reason, I don't think it is proper to characterize this aspect of this decision as a finding that he made a clearly erroneous decision as much as it is that he got the law wrong with respect to this part of his decision.

We do not agree. The bankruptcy court's distinction of *Reisman* was used to reinforce the conclusion that Bonnanzio lacked constructive intent to deceive, but that distinction was not the basis for its finding of fact. After a full trial in which the bankruptcy judge had the opportunity to hear Bonnanzio testify, the court specifically found: "Considering the totality of circumstances surrounding the debtor's execution of the credit application, the court finds that no intent to deceive might be constructed because of reckless disregard of the consequences of her acts." There is no doubt that the bankruptcy court applied a proper standard: intent to deceive can be inferred from the totality of circumstances, including reckless disregard. *In re Cohn,* 54 F.3d 1108, 1118–19 (3d Cir.1995); *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994); *In re Black,* 787 F.2d 503, 506 (10th Cir.1986); *In re Martin,* 761 F.2d 1163, 1167 (6th Cir.1985). We conclude that a bankruptcy court's finding under section 523(a)(2)(B) as to the debtor's intent to deceive is a finding of fact that is reviewed for clear error, and that the bankruptcy court's discussion of *Reisman* did not alter the nature of that finding. As the district court stated: "I'm mindful . . . that [Judge Ryan's] factual findings deserve the deference that's built into the clearly erroneous standard of review. . . ."

There is substantial unanimity of view that intent to deceive is an issue of fact. *In re Norris,* 70 F.3d 27, 29 (5th Cir.1995); *Miller,* 39 F.3d at 304; *In re Liming,* 797 F.2d 895, 897 (10th Cir.1986); *In re Long,* 774 F.2d 875, 877–78 (8th Cir.1985); *see In re Shaheen,* 111 B.R. 48, 52 (S.D.N.Y.1990) (Leisure, J.); *see also In re Sheridan,* 57 F.3d 627, 634 (7th Cir.1995) (applying clearly erroneous standard to finding of intent to deceive).

*Reisman* does not affect this analysis. In *Sheridan,* the bankruptcy court had found that the debtor lacked any intent to deceive, even though the creditor adduced considerable circumstantial evidence that the debtor misapplied borrowed funds. The district court affirmed. On appeal to the Seventh Circuit, the creditor cited numerous cases in which courts had found such intent on similar evidence, and argued that the bankruptcy court therefore erred on the issue of intent as a matter of law. The circuit court held:

> While these cases would support the bankruptcy court's decision had it inferred an intent to deceive from the circumstantial evidence admitted in this case, they do not compel such a finding and do not require us to reverse the court's holding. . . . Whether to infer the requisite intent is left to the bankruptcy court that presides over the case. Because that court is in the best position to observe the witnesses and presentment of the evidence, we review its findings only for clear error. . . .

57 F.3d at 634; *see also Shaheen,* 111 B.R. at 53 (where intent is at issue, the debtor's credibility is a substantial factor, and the bankruptcy court's assessment thereof is entitled to great deference); Fed. R. Bankr.P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

In sum, the district court's conclusion that National Union had demonstrated Bonnanzio's reckless disregard for the consequences of her actions—and, concomitantly, a constructive intent to deceive—was based on a failure to accord the bankruptcy court's factual finding the appropriate degree of deference. We conclude that the bankruptcy court's finding in this respect was not clearly erroneous.

■ An alternate ground for the district court's ruling on intent to deceive is that Berlin's fraudulent intent should be imputed to Bonnanzio under general principles of agency. Since the bankruptcy court made no factual findings with regard to this specific issue, the district court's ruling can only stand if it is correct as a matter of law.

We observe at the outset that there is conflicting authority regarding whether, under § 523(a)(2)(B), the fraudulent intent of a debtor's agent may be imputed to the debtor without a further finding that the debtor knew or should have known of the fraud. No court of appeals has directly ruled on this issue, but the Third Circuit has observed in dicta that "common law principles of agency law would probably dictate the imputation of an agent's fraud to a principal under a § 523(a)(2)(B)(iv) analysis." *Cohn,* 54 F.3d at 1119. The Eighth Circuit, construing a closely related provision of the bankruptcy code, has held that "more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. . . . If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the debtor-principal." *In re Walker,* 726 F.2d 452, 454 (8th Cir.1984) (per curiam) (construing 11 U.S.C. § 523(a)(2)(A)).

In cases under § 523(a)(2)(B), some bankruptcy courts have held that an agent's fraud cannot be imputed to the debtor without some showing that the debtor knew or should have known of the fraud. *See, e.g., In re Futscher,* 58 B.R. 14, 17 (Bankr.S.D.Ohio 1985); *In re Anderson,* 29 B.R. 184, 190–91 (Bankr.N.D.Iowa 1983). Several other courts, however, have sharply criticized these cases and the Eighth Circuit's decision in *Walker* as contrary to the legislative history and proper statutory interpretation of § 523. *See, e.g., In re Calhoun,* 131 B.R. 757, 760–62 (Bankr.D.D.C.1991); *BancBoston Mortgage Corp. v. Ledford,* 127 B.R. 175, 180–85 (M.D.Tenn.1991), *aff'd,* 970 F.2d 1556 (6th Cir.1992), *cert. denied,* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); *In re*

*Paolino*, 75 B.R. 641, 645–50 (Bankr.E.D.Pa. 1987).

We need not decide this issue at this time, because a ruling either way would not dispose of this case. The bankruptcy court made no factual findings as to whether Bonnanzio knew or should have known of Berlin's fraud. If we hold that such a showing is necessary to demonstrate an intent to deceive under § 523(a)(2)(B), we would still have to remand so that the bankruptcy court could make that factual determination in the first instance. On the other hand, if we hold that no such showing is necessary, Bonnanzio may still prevail, on the theory that a principal is not charged with an agent's misdeeds if the agent acts in a manner completely adverse to the principal's interest. *See In re Maxwell Newspapers, Inc.*, 151 B.R. 63, 69 (Bankr.S.D.N.Y.1993); *see also United States v. 141st Street Corp.*, 911 F.2d 870, 876 (2d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n. 10 (2d Cir.1983); *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir.), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936).

This "adverse interest exception" was argued to the district court, but the court invoked the rule that a principal cannot rely on an agent's adverse interest if the principal knowingly retains a benefit that resulted from the agent's fraud, *see Restatement (Second) of Agency* § 282 (1958), and held that Berlin's conduct was not entirely adverse to Bonnanzio's interest because she received tax benefits from the tax shelter.

We think the issue is more complicated. The bankruptcy court found that Berlin's interest was in closing Bonnanzio's participation in Northgate, so that he could collect a substantial commission on the larger transaction. He was so eager to get this commission that he loaned Bonnanzio the money for the down payment. A finder of fact could conclude: that Bonnanzio's tax shelter was purely incidental to Berlin's real objective, his commission on the placement; that the commission was in fact the only object of Berlin's conduct; and that Bonnanzio's contracting of a $73,663 debt for an investment she did not understand was no benefit to her

at all. It is therefore unclear on this record whether Berlin was acting in a manner completely adverse to Bonnanzio's interests. The matter should be resolved by the bankruptcy court in the first instance.

■ The district court emphasized that Bonnanzio cannot rely on the adverse interest exception, because she retained a benefit as a consequence of the fraud. Whether Bonnanzio retained a benefit from Berlin's fraud is, at least in part, a question of fact. The district court and National Union adduce two examples of benefits received by Bonnanzio: (1) an increase in Bonnanzio's withholding allowances that increased her take-home pay and (2) Bonnanzio's 1984 tax deduction. We doubt that the increased allowances can be described as a benefit accruing from the fraud. Berlin, as Bonnanzio's accountant, contacted Bonnanzio's employer and arranged for the lower withholding, but that arrangement did nothing to lower Bonnanzio's eventual tax liability. In fact, if too little were withheld from Bonnanzio's salary, Berlin could have exposed Bonnanzio to liability for tax penalties.

Bonnanzio took a tax deduction for tax year 1984 in respect of her Northgate investment. Although this benefit did not flow from National Union, it could be a benefit of the transaction, and, in a tax shelter, may be the chief benefit that ever accrues. On the other hand, the record may support the inference that Bonnanzio received no benefit from Berlin's actions. Berlin's machinations placed upon Bonnanzio a large obligation that she may not have sought or understood. When she received her first statement in March 1984, she immediately tried to exit. She turned to Berlin, as her accountant, to get her out, but he demanded additional money to extricate her from an investment he had told her would be readily marketable. She thus kept her partnership interest, and took a tax deduction for it when she filed her 1984 tax return in 1985, *after* she dismissed Berlin as her accountant. Whether Bonnanzio received a benefit from Berlin's fraud is unclear on this record, and a determination by the bankruptcy court is required, should that court reach this issue.

We further observe that, even if a principal receives a benefit from an agent's fraudulent actions, under agency principles that benefit is only significant if the principal knowingly retains it before a change of position. *See Restatement (Second) of Agency* § 282(2)(c). We are unaware of any case that has addressed this particular issue of agency law in the bankruptcy context. Generally, a change in position is a change in the principal's circumstances induced by the receipt of the benefit. *See Restatement (First) of Restitution* § 178 cmt. a (1937) ("The right to restitution from another for a benefit conferred upon him is terminated if circumstances have so changed that it would be inequitable to require him to make restitution."). If, however, before the principal changes position, she has notice of facts indicating that the benefit is not rightfully hers, then a change in position will not preclude restitution. *See id.* § 178 cmt. b. The object of holding liable a principal who knowingly retains a benefit from the agent's misdeeds— even when the agent acts against the principal's interest—is to facilitate restitution and prevent the unjust enrichment of the principal. *See Restatement (Second) of Agency* § 282 cmt. h. This rule is equitable, as is bankruptcy law in general. It is unclear, however, that restitution principles govern this case, because Bonnanzio is not holding any asset of National Union that could be subject to a claim for restitution. At any rate, since the bankruptcy court may not reach this complicated agency issue, we do not decide at this time whether a principal who knowingly retains the benefit of an agent's fraud (even if the agent acts in a manner completely adverse to the principal's interest) can have an intent to deceive within the meaning of 11 U.S.C. § 523(a)(2)(B). If the bankruptcy court finds it necessary to reach this issue, it should make that determination in the first instance.

In sum, we find that several material factual and legal issues must be resolved before this dispute can be decided. We therefore remand this case to the district court with instructions to remand to the bankruptcy court, so that the parties may have an opportunity to brief these issues more fully, and so that the bankruptcy court may make the necessary determinations in the first instance. *See In re McLean Indus.*, 30 F.3d 385, 388 (2d Cir.1994) (per curiam), *cert. denied*, —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). In particular, we remand for decisions on the following: (1) whether, under 11 U.S.C. § 523(a)(2)(B), the fraudulent intent of a debtor's agent may be imputed to the debtor without a further finding that the debtor knew or should have known of the fraud; (2) if so, whether Bonnanzio knew or should have known of Berlin's fraudulent actions; (3) in any event, whether Berlin acted in a manner that was completely adverse to Bonnanzio's interest; (4) if so, whether a debtor who knowingly retains the benefit of an agent's fraud before a change in position has the requisite intent to deceive under § 523(a)(2)(B); and (5) if so, whether Bonnanzio did knowingly retain such a benefit and therefore had the requisite intent to deceive.

## B. *Reasonable Reliance.*

The bankruptcy court found that, in issuing its bond, National Union relied entirely on the value of the partnership unit that was pledged as collateral, and did not rely at all (reasonably or otherwise) on Bonnanzio's financial statement. The district court held that this finding was clearly erroneous, and we agree. Since the bankruptcy court concluded that National Union had failed to demonstrate that it relied on Bonnanzio's financial statement, that court made no specific finding on whether such reliance would have been reasonable. In entering judgment for National Union, the district court implicitly concluded that National Union had demonstrated that its reliance was reasonable. Because the reasonableness of National Union's reliance is a question of fact, it ought to be resolved by the bankruptcy court in the first instance.

In concluding that National Union did not rely on Bonnanzio's financial statement, the bankruptcy court cited testimony in the record that

it was National Union's general practice (1) to look first at the general partner to make sure that it was a known entity, (2) to look into the general partner's financial

stability and record, (3) to do a lesser amount of due diligence when the deal had been brought in through a nationally known broker dealer, and (4) to rely first to a greater extent on the broker dealer who handled these transactions, then to look at the private placement.

In addition, the bankruptcy court noted that there was testimony that "usually National Union would conduct an independent review of each investor's documents even when the documents were sent from well known entities such as [Rothschild]." However, the bankruptcy court found that this testimony was contradicted by evidence that National Union relied on the marketability and value of the collateral. We agree with the district court that there is no contradiction between reliance on the credit application and reliance on the marketability of the collateral, and that therefore the evidence of National Union's reliance is uncontroverted. Accordingly, the bankruptcy court clearly erred in concluding that National Union failed to sustain its burden of demonstrating reliance.

 We turn, then, to the district court's implicit conclusion that National Union's reliance was reasonable. "Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'" *Woolum*, 979 F.2d at 76 (quoting *In re Martin*, 761 F.2d 1163, 1166 (6th Cir.1985)). Reasonableness is therefore "a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith." *In re Shaheen*, 111 B.R. 48, 53 (S.D.N.Y.1990); *see also In re Reisman*, 149 B.R. 31, 39 (Bankr. S.D.N.Y.1993) (requirement of reasonable reliance was intended to prevent unscrupulous creditors from inducing debtors to submit false statements for later use to challenge discharge); *Martin*, 761 F.2d at 1166 (citing legislative history); *In re Ophaug*, 827 F.2d 340, 343 (8th Cir.1987); *Lansford*, 822 F.2d at 904 ("Having intentionally misled the [creditors] in an area [the debtor] knew was important to them, it is unseemly for [the debtor] now to argue that he should be excused from section 523 because the [creditors] believed him.").

Although the reasonableness requirement of § 523(a)(2)(B)(iii) presents a low threshold for National Union to meet, whether National Union has met that threshold is a question of fact. Eight courts of appeals have so held, and we agree. *In re Coston*, 991 F.2d 257, 260 (5th Cir.1993) (en banc) (per curiam); *In re Woolum*, 979 F.2d 71, 75–76 (6th Cir.1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993); *In re Watson*, 958 F.2d 977, 978 (10th Cir.1992); *In re Collins*, 946 F.2d 815, 817 (11th Cir.1991) *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir.1989); *In re Lansford*, 822 F.2d 902, 904 (9th Cir.1987); *accord In re Cohn*, 54 F.3d 1108, 1118 (3d Cir.1995); *In re Menna*, 16 F.3d 7, 11 (1st Cir.1994). The reasonableness of reliance requires the fact finder to consider "the totality of the circumstances," and we recognize that the bankruptcy court is "most familiar" with this factual setting and has had the opportunity to judge the credibility of the witnesses. *Coston*, 991 F.2d at 261–62. Accordingly, whether National Union's reliance was reasonable is a matter for the bankruptcy court to determine on remand.

## CONCLUSION

For the reasons set forth above, we reverse the judgment of the district court and remand with instructions to remand to the bankruptcy court for further proceedings.